[Cite as *In re J.N.*, 2020-Ohio-4157.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

|  |  |  |
|---|---|---|
| IN THE MATTER OF: | : | |
| | : | |
| J.N. | : | Appellate Case No. 2019-CA-82 |
| | : | |
| | : | Trial Court Case No. 20170486 |
| | : | |
| | : | (Appeal from Common Pleas |
| | : | Court – Juvenile Division) |
| | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 21st day of August, 2020.

. . . . . . . . . . .

JOHN M. LINTZ, Atty. Reg. No. 0097715, Clark County Prosecutor's Office, Appellate Division, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
        Attorney for Appellee

KIRSTEN KNIGHT, Atty. Reg. No. 0080433, P.O. Box 137, Germantown, Ohio 45327
        Attorney for Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Father, the biological father of J.N., a minor child, appeals from a judgment that awarded permanent custody of J.N. to Clark County Department of Job and Family Services (DJFS). The judgment of the trial court will be affirmed.

## Factual and Procedural Background

{¶ 2} J.N. was born in May 2008. In February 2017, then 8-year-old J.N. was residing with his mother ("Mother"), Mother's live-in boyfriend, and two half-sisters in an apartment in Springfield. At that time, Father, who was living in Columbus, Ohio, reportedly had not seen J.N. in over two years.

{¶ 3} On March 6, 2017, the Clark County DJFS received a neglect referral for J.N., after a non-relative named Imani McCauley called the police to report that she had been caring for J.N. for approximately three weeks. According to McCauley, J.N. had been playing with McCauley's nephew and asked if he (J.N.) could spend the night with McCauley and her nephew. McCauley told J.N. to ask Mother, who granted permission for J.N. to stay overnight with McCauley. McCauley gave her telephone number to Mother for use in case of an emergency, but Mother told McCauley that she (Mother) did not have a telephone.

{¶ 4} The following morning, McCauley returned J.N. to his apartment to drop him off, but no one answered the locked apartment door. McCauley tried several more times that day and over the following three weeks, with the same result. Mother never contacted McCauley. McCauley was transporting J.N. to and from his school, where a teacher advised McCauley that Mother had been picking up J.N.'s half-sister from the same school, but ignored J.N.

{¶ 5} Despite a "long history" with DJFS due to past domestic violence, J.N.'s behavior at school, and sexual abuse allegations against Mother's then-boyfriend, Mother had not followed through with agency recommendations, and "continued to allow her children around" her boyfriend. (Complaint for Temporary Custody Order, 4/11/17, p. 2.) Additionally, during an interview with a social worker, "J.N. disclosed sexual abuse, witnessing domestic violence, and seeing drugs in his home." (*Id.*)

{¶ 6} On April 11, 2017, DJFS filed a complaint to have J.N. adjudicated as a dependent child, with temporary custody to be granted to the agency.[1] Both Mother and Father were served with copies of the complaint. Eight days after the original complaint, DJFS filed an additional complaint for an emergency shelter care order. According to the latter complaint, a social worker arrived for a scheduled home visit with Mother on April 17, 2017, and witnessed Mother's boyfriend, against whom allegations of sexual abuse had been made, drop off three children at the apartment where the family lived. Mother did not answer the door of the apartment and social workers were unable to reach her. The agency alleged that the imminent risk of harm posed by the stepfather's unsupervised presence with the children presented an exigent circumstance requiring immediate action. On April 19, 2017, the trial court entered a temporary shelter care order granting temporary custody of J.N. to DJFS.[2] The court thereafter appointed a guardian ad litem ("GAL") to act on J.N.'s behalf.

---

[1] It appears that J.N. remained in McCauley's care pending a court order regarding his placement. (*See* 4/11/17 Complaint for Temporary Custody Order, p. 3, and 4/19/17 Complaint for Emergency Shelter Care Order, p. 4).

[2] The same incident also resulted in the removal of J.N.'s two half-sisters from Mother's home. However, as Father is not the biological parent of either girl and does not challenge the trial court's judgment as to their placements, we will not discuss those related cases.

{¶ 7} The record indicates that Father began regular visitation with J.N. after he (J.N.) was removed from Mother's home. On May 15, 2017, the court issued an Agreed Judgment Entry Modifying Temporary Custody to Legal Custody Order, and awarded legal custody of J.N. to Father. However, on September 25, 2017, DJFS moved to modify that order and award custody of J.N. to Father's sister ("Paternal Aunt") instead. The motion stated:

In August 2017, [Father] was admitted into Grandview [H]ospital mental health and remained for four days. [Father] has been diagnosed with paranoid schizophrenia. [Father] also screened positive for cocaine once he was admitted at Grandview. [Paternal Aunt] has an approved home study and is appropriate for providing care to J.N. [Father] is in agreement with the legal custody being granted to [Paternal Aunt].

Mother * * * has made little or no progress on her case plan. Therefore, it is not an option to return the child to either parent at this time.

(Motion to Modify Legal Custody, 9/25/17.)

{¶ 8} Following a hearing before a magistrate, interim temporary custody of J.N. was awarded to Paternal Aunt on October 26, 2017. On November 27, 2017, the award to Paternal Aunt was modified to temporary legal custody, through June 1, 2018.

{¶ 9} On November 28, 2017, DJFS filed a case plan setting forth specific case plan objectives for Father, including his being able to provide J.N. with a safe and stable environment free of drugs, alcohol, and domestic violence; being able to ensure that all of J.N.'s needs (food, shelter, clothing, medical, counseling) were met on a regular basis; and visiting J.N. regularly at the agency visitation center to establish a relationship with

J.N. Due to both parents' lack of progress on their case plan objectives, the plan's stated goal was to permanently place J.N. with a relative. The plan stated that Father had visited J.N. inconsistently and had not sought custody of J.N. while he (J.N.) was in Mother's care; it also said that J.N. had reported concerns about drugs, alcohol, and domestic violence with regard to Father. According to the case plan, J.N. said he did not want to reside with Father; "reportedly when [J.N.] has visited [Father], he (J.N.) has requested to go home after a couple of days." (11/28/17 Case Plan, p. 7.)

{¶ 10} In January of 2018, DJFS moved to modify Paternal Aunt's award from temporary legal custody to legal custody of J.N., but that motion was dismissed after DJFS learned that Paternal Aunt "only wishes to have temporary custody of the child at this time." (Motion to Dismiss Motion, 2/27/18.) Instead, Paternal Aunt's temporary legal custody was extended. A semiannual report filed by DJFS in March of 2018 stated that J.N. "has some behavior concerns and is aggressive at school," but was receiving counseling. (Semiannual Administrative Review, 3/27/18, p. 2.) At that time, Father was not included in the case plan, and Mother was reported to have made limited or insufficient progress toward her plan objectives. DJFS recommended that J.N. remain in Paternal Aunt's temporary legal custody but maintained a goal of parental reunification.

{¶ 11} Subsequently, DJFS again moved to have legal custody of J.N. awarded to Paternal Aunt,[3] but following a hearing, the magistrate determined that "additional time is needed to stabilize [J.N.] in the placement [with Paternal Aunt] to provide the best possible opportunity for this placement to be permanent." (Magistrate Decision, 7/30/18, p. 1.) As

---

[3] *See* Motion to Modify Temporary Legal Custody to Legal Custody, 5/4/18.

a result, Paternal Aunt's temporary legal custody was extended through January 20, 2019.

{¶ 12} In an updated case plan filed on August 29, 2018, DJFS noted that Father, at his request, was added back to the case plan in August 2018, after having been removed due to his mental health and other issues. The plan objectives established by DJFS were for Father to complete drug and alcohol and mental health assessments and follow through with any recommendations; to complete a parenting psychological exam and follow through with any recommendations; to attend domestic violence[4] and parenting classes; and to provide a safe and stable home environment for J.N. Parental reunification remained the goal as to J.N. Both parents signed that document.

{¶ 13} On January 18, 2019, DJFS again moved to modify Paternal Aunt's custody status regarding J.N. from temporary legal custody to legal custody. The GAL concurred in that motion, noting as follows:

> [J.N.] has special needs for counseling, care and education. [Paternal Aunt] has a difficult time meeting all of his needs, not because she is unable to do so, but because [J.N.]'s needs are so great and varied. He (J.N.) is beginning a new program that is very intensive and will hopefully help [J.N.] achieve success in learning and in handling the psychological issues he faces.

(Report of the Guardian Ad Litem, 3/5/18, p. 2.)

{¶ 14} Because "the parties [we]re not in agreement" as to DJFS's motion, the

---

[4] It appears that, prior to signing the case plan document, Father crossed out the reference to domestic violence classes and initialed that change. (*See* 8/29/18 case plan, p. 5).

matter was set for an evidentiary hearing. (Magistrate's Order, 2/27/19.) Prior to the hearing date, however, DJFS once again moved to modify J.N.'s custodial status, this time to award permanent custody to the agency. According to that motion, Paternal Aunt had decided that she was "no longer able to care for the child" (J.N.). (Motion to Modify, 3/15/19, p. 2.) The evidentiary hearing date therefore was reset. In the interim, the trial court issued an ex parte order, finding that "there is probable cause to believe that [J.N.] is or may be suffering from illness or injury and is not receiving proper care, or is at risk for harm and that the best interest of the child requires immediate and Ex Parte action to prevent immediate or threatened physical harm." (Ex Parte Order, 4/8/19.) The court ordered J.N. removed from Paternal Aunt's care and placed in the custody of DJFS. The GAL thereafter reported that J.N.'s stated preference was to remain with Paternal Aunt, but Paternal Aunt no longer was able to provide his care.

{¶ 15} On July 19, 2019, a custody trial regarding J.N. was held before a magistrate in the Domestic Relations Division of the Clark County Common Pleas Court. Father appeared and was represented by counsel; an attorney also appeared on Mother's behalf, but stated that he had been unable to reach his client to discuss the trial or secure her attendance. (Tr., p. 5.) The GAL appointed for J.N. also was present and participated in cross-examining the witnesses.

{¶ 16} Testifying first, Marci Amato, a licensed social worker and supervisor with DJFS, presented an overview of the agency's involvement with J.N., Mother, and Father since March 2017. (*Id.*, p. 5-27.) Amato supervised Amy Campbell, the social worker assigned to J.N.'s case, and was personally familiar with the circumstances of the case. Amato said that DJFS's contact with Mother had been "very sporadic, very minimal," and

that Mother had not visited J.N. since January 2018 (some 18 months before the trial date.) (*Id.*, p. 7, 9.) Amato stated that Mother had failed to engage with the case plan aimed at reunification. She also said she was not aware of Mother's having housing at the time of trial or of Mother's wishes as to J.N.'s placement.

{¶ 17} Amato described contact with Father as also "sporadic," due in part to Father's multiple hospitalizations for mental health issues.[5] (*Id.*, p. 11, 16.) She said that the agency was unaware of "the significance of [Father's] drug and alcohol use and his mental health" problems when the initial case plan was developed and J.N. was placed with Father; at that time, the agency simply was "looking to reunify [J.N.] with [Father]." (*Id.*) She stated that J.N. lived with Paternal Aunt for a year and a half after Father's first hospitalization, until Paternal Aunt "requested his (J.N.'s) removal" in April of 2019 because "his behaviors were too significant for her." (*Id.*, p. 13.)

{¶ 18} Amato said that Father had refused to come to the visitation center to see J.N. since supervised visits were reinstated. According to Amato, Father disagreed with certain recommendations in his case plan, particularly those regarding the use of mental health medications. Father also refused to sign releases for DJFS to obtain copies of his treatment and employment records; as a result, the agency was unable to confirm Father's compliance with the objectives the case plan established for him. Amato opined that Father was unable to effectively parent J.N. and that granting permanent custody to the agency would be in J.N.'s best interest.

{¶ 19} Father then testified about his desire to regain custody of J.N. He

---

[5] According to Amato's testimony, Father was hospitalized five times for such problems, whereas the State's cross-examination of Father placed the number of hospitalizations at four.

addressed his then-current housing situation, his progress regarding his substance abuse and mental health issues, his efforts to meet the case plan objectives established by DJFS, and his dissatisfaction with the social worker assigned to J.N.'s case.[6] (*Id.*, p. 27-64.) Father reported that Campbell, the existing social worker, had insisted that he (Father) should be taking medication for his mental issues, despite his psychiatrist's contrary advice.[7] He also said that he objected when the social worker suggested that J.N. should be prescribed Ritalin after "throwing chairs at the teacher." (*Id.*, p. 39.) Father acknowledged that he had not seen J.N. during the seven months preceding the trial. (*Id.*, p. 60.)

{¶ 20} On August 23, 2019, the magistrate issued a decision granting DJFS's motion for permanent custody and terminating Mother's and Father's parental rights and duties. Through new counsel, Father filed timely objections to that decision, arguing that clear and convincing evidence did not establish that permanent custody to the agency was in J.N.'s best interest, and that he (Father) was denied the effective assistance of counsel. On November 20, 2019, the trial court entered a judgment overruling Father's objections, granting DJFS's motion for permanent custody of J.N., placing J.N. in the permanent custody of DJFS as of August 23, 2019, and terminating Mother's and Father's

---

[6] Shortly before the custody trial, Father filed a motion for Campbell's removal from J.N.'s case and the appointment of a different social worker. (Motion for Alternate CCJFS Caseworker and Supervised Visitation, 7/2/19). The trial court apparently did not address that motion prior to trial.

[7] The individual Father identified as his "psychiatrist" actually denominated herself as "PMHNP-BC" (an acronym for "Psychiatric Mental Health Nurse Practitioner") on a document Father presented at trial. (*See* Tr., pp. 36, 57-59 and Father's Exh. B). The trial court declined to admit that unauthenticated exhibit. (*Id.*, p. 37). The record contains no competent evidence regarding any health care professional's recommendation as to Father's use of drugs for mental health treatment.

parental rights.

{¶ 21} Father appeals from that judgment, setting forth this single assignment of error: "The Trial Court erred in granting permanent custody to Clark County Children's [sic] Services because that agency failed to prove by clear and convincing evidence that permanent custody was in the best interest of the minor child."

**Standard of Review**

{¶ 22} An appellate court will not reverse a decision regarding permanent or legal custody of a child absent an abuse of discretion by the juvenile court. *See In re K.W.*, 185 Ohio App.3d 629, 2010-Ohio-29, 925 N.E.2d 181, ¶ 15 (2d Dist.) (applying abuse of discretion standard to decision granting permanent custody and terminating parental rights); *In re M.O.*, 2d Dist. Montgomery No. 26457, 2015-Ohio-2430, ¶ 7 (applying abuse of discretion standard to decision granting legal custody). The term "abuse of discretion" implies that the court's decision was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 23} If the juvenile court's determination as to a child's best interest is not supported by competent, credible evidence, that decision is unreasonable, and we may reverse. *In re Starks*, 2d Dist. Darke No. 1646, 2005-Ohio-1912, ¶ 17, citing *In re Nice*, 141 Ohio App.3d 445, 455, 751 N.E.2d 552 (7th Dist.2001). However, "the discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). Because "[t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed

record[,] * * * the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct." (Citations omitted.) *Id.* Such deference to the trial court's findings "is even more crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does *not* translate to the record well." (Emphasis sic.) *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

### Law Governing Permanent and Legal Custody Decisions

{¶ 24} The United States Supreme Court has stated that a parent's interest in the care, custody, and control of his or her children "is perhaps the oldest of the fundamental liberty interests recognized by" that court. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Unless they forfeit the right through specific conduct, "suitable" parents have a "paramount" right to the custody of their minor children. *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977). Still, "the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed." (Citation omitted.) *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 25} When certain stated circumstances exist, a juvenile court may grant permanent custody of a child to a child services agency pursuant to R.C. 2151.414(B)(1) upon determining that permanent custody is in the child's best interest. Because an award of permanent custody is " 'a drastic remedy' " that "involves the termination of parental rights," permanent custody determinations must be based upon clear and convincing evidence. *In re S.M.*, 2d Dist. Montgomery No. 24539, 2011-Ohio-6710, ¶ 4, fn.1, quoting *In re A.W.*, 2d Dist. Montgomery No. 21309, 2006-Ohio-2103, ¶ 6; *see also* R.C.

2151.414(B)(1) and (E). "Clear and convincing evidence" is " 'the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established.' " *In re Rose*, 2017-Ohio-694, 85 N.E.3d 498, ¶ 19 (2d Dist.), quoting *In re Estate of Haynes*, 25 Ohio St.3d 101, 104, 495 N.E.2d 23 (1986). "Clear and convincing" means "more than a mere preponderance," but less than "clear and unequivocal." *Id.*

{¶ 26} R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency. First, the court must find by clear and convincing evidence that the child either (a) cannot or should not be placed with either parent within a reasonable period of time; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period. *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14, citing *In re K.M.*, 8th Dist. Cuyahoga No. 98545, 2012-Ohio-6010, ¶ 8; R.C. 2151.414(B)(1). Second, the court must determine that granting permanent custody to the agency is in the child's best interest. *Id.*

{¶ 27} In determining a child's "best interest" under R.C. 2151.414(B)(1), a court must consider the factors set forth at R.C. 2151.414(D)(1). Those factors include:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c)   The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) [Whether additional factors listed at R.C. 2151.414(E)(7)-(11) apply].

R.C. 2151.414(D)(1).

{¶ 28} As an alternative to an award of permanent custody, a juvenile court may award legal custody of a dependent child to a non-parent who asks for legal custody or is proposed as a legal custodian. *In re A.F.*, 2018-Ohio-310, 103 N.E.3d 1260, ¶ 51 (2d Dist.), citing R.C. 2151.353(A)(3). Significantly, however, "R.C. 2151.353(A) does not require a juvenile court to consider placing [a] child[ ] with a relative prior to granting the permanent custody request of an agency." *In re A.A.*, 2d Dist. Greene No. 2008 CA 53, 2009-Ohio-2172, ¶ 19.

### Father's Appeal from Custody Decision regarding J.N.

{¶ 29} Father's lone assignment of error contends that the trial court erred in granting permanent custody of J.N. to DJFS because the agency failed to prove by clear and convincing evidence that such an award was in J.N.'s best interest.[8] Notably,

---

[8] Although R.C. 2151.414(B)(1) establishes "clear and convincing evidence" as the proper standard to be applied by a juvenile court in determining a child's best interest, we again note that the issue on appeal is whether a particular best interest determination is supported by competent, credible evidence. *See In re Starks*, 2d Dist. Darke No. 1646, 2005-Ohio-1912, at ¶ 17. In other words, we will affirm the trial court's determination that

however, the arguments set forth in Father's brief actually challenge not only the trial court's "best interest" determination under R.C. 2151.414(D)(1), but also its conclusion that J.N. was eligible to be placed in the agency's permanent custody because one of the circumstances enumerated under R.C. 2151.414(B)(1) applied. (Brief of Appellant (Father), p. 5.) We will consider both aspects of Father's argument.

{¶ 30} In entering the judgment at issue, the trial court stated in part as follows:

There is no dispute that the clear and convincing evidence is that the child in this matter has been in the custody of CCDJFS for twelve of the last consecutive twenty-two months and meets the first requirement in determining permanent custody. There is also no dispute that the child has been in seven different placements since CCDJFS became involved with the family.

\* \* \*

The evidence presented at trial was clear and convincing that the father had not followed through with his case plan objectives. It is not the testimony of CCDJFS' representative, but rather the father's own testimony at trial[,] that provides the most detail of his non-compliance. The father's testimony shows how combative he was towards the requests of CCDJFS to work the case plan. Most telling is his own admission that he refused to visit with his child for several months prior to trial because he wanted to prove a point to his caseworker. The only point the father provided in that

---

"clear and convincing evidence" supports an award of permanent custody to the agency if "competent, credible evidence" supports the trial court's conclusion to that effect.

situation was that [he was] not only willing to give up precious time with his child, but also the opportunity to reunite [with] and parent his child.

Additionally, the father refused to sign any releases of information for CCDJFS for them to review his drug and alcohol treatment and mental health treatment. He further refused to attend any kind of domestic violence classes as required by his case plan. The Father [sic] showed no evidence that he completed any parenting class as required by the case plan.

After a careful review and consideration of the evidence present at trial and the applicable law, the Court concludes that there was clear and convincing evidence presented at trial to support the Magistrate's findings and conclusions. * * *

(Citations omitted.) (11/20/19 Judgment Entry, p. 4.)

{¶ 31} We find no abuse of discretion in the trial court's findings. "[A] child shall be considered to have entered the temporary custody of an agency on the earlier of the date that the child is adjudicated [neglected or dependent] or the date that is sixty days after the removal of the child from home." R.C. 2151.414(B)(1). The record confirms that J.N. entered DJFS's custody no later than April 19, 2017, the date of the order awarding the agency temporary shelter care custody of J.N. Because DJFS retained supervisory authority during the periods when Father and Paternal Aunt consecutively were granted legal custody and temporary legal custody, respectively, those intervening custody arrangements did not deprive DJFS of continuing custody as to J.N. *See In re S.R.*, 10th Dist. Franklin Nos. 05AP-1356, 05AP-1366, 05AP-1367, 05AP-1373, 2006-Ohio-4983. Accordingly, as of the July 10, 2019 hearing date, J.N. had been in DJFS custody for

more than 12 of the prior 22 consecutive months, satisfying the first prong of R.C. 2151.414's two-part test for determining motions to award permanent custody to a public services agency. *See* R.C. 2151.414(B)(1)(d). The trial court did not err in that regard.

{¶ 32} Although Father urges that DJFS failed "to establish that [J.N.] could not be placed with Father within a reasonable time" in accordance with R.C. 2151.414(B)(1)(a) (Brief of Appellant (Father), p. 5), DJFS was not required to provide such proof given that the undisputed evidence satisfied R.C. 2151.414(B)(1)(d). On its face, R.C. 2151.414(B)(1)(a)'s "reasonable time" consideration applies only if the child at issue "has *not* been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period." (Emphasis added.) "[I]f the facts of a given case trigger [R.C. 2151.414(B)(1)(d)], then it is unnecessary for the court to analyze whether or not the child[ ] could be placed with either of the parents within a reasonable time, or should be placed with either parent, under R.C. 2151.414(B)(1)(a)." *In re S.R.* at ¶ 27. Competent, credible evidence supported the trial court's conclusion that J.N. was eligible for permanent placement with DJFS under R.C. 2151.414(B)(1)(d), and Father's challenge based upon R.C. 2151.414(B)(1)(a) is not well taken.[9] The first prong of R.C. 2151.414's two-part test for permanent custody was met.

{¶ 33} Under the second prong of that two-part test, the same undisputed facts regarding J.N.'s long-term presence in DJFS's continuing custody weighed in favor of an award of permanent custody to the agency as being in J.N.'s best interest. *See* R.C.

---

[9] Although our conclusion as to R.C. 2151.414(B)(1)(a) obviates the need to analyze R.C. 2151.414(B)(1)'s alternative first-prong criteria, we note that the evidence presented to the trial court arguably also would support a conclusion that J.N. could *not* safely be placed with Father within a reasonable time, in accordance with R.C. 2151.414(B)(1)(d).

2151.414(D)(1)(c). Competent, credible evidence also supported the trial court's conclusion that the other factors enumerated at R.C. 2151.414(D)(1) demonstrated that J.N.'s best interest would be served by awarding permanent custody to DJFS.

{¶ 34} With regard to R.C. 2151.414(D)(1)(a), significant evidence counters Father's contention that J.N. was "bonded with Father." (Brief of Appellant (Father), p. 5.) The record shows that prior to March 2017, Father had not seen J.N. in more than two years, and Father's subsequent efforts to rebuild a relationship with J.N. ended abruptly when Father was hospitalized for schizophrenia in August 2017. The record reflects only "sporadic" contact between Father and J.N. thereafter, and by Father's own choosing, he had not visited J.N. in the seven months preceding the custody trial. Asked at trial to describe his relationship with J.N., Father termed it "pretty good * * * I mean, I don't let him talk back to people. I mean, I'm going to voice my opinion." (Tr., p. 30.) He offered little to substantiate his "pretty good" characterization. In addition, J.N. was reported to have expressed some reluctance to live with Father, and when expressly asked his (J.N.'s) preference as to a future placement, he identified Paternal Aunt, not Father, as his choice.

{¶ 35} J.N.'s half-sisters were not Father's children and also were in DJFS custody. While Father claimed that J.N. "interacted * * * real good" with the children of Father's cousin on whose property Father was living (Tr., p. 30), the evidence suggested that J.N. had experienced only limited prior contact with those extended family members. Consequently, the trial court reasonably could conclude under R.C. 2151.414(D)(1)(a) that J.N.'s "interaction and interrelationship" with his parents, siblings, and other relatives did not favor placement with Father.

**{¶ 36}** Although a child's wishes, as expressed through his or her GAL, are a factor to be considered under R.C. 2151.414(D)(1)(b), J.N.'s wish to live with Paternal Aunt could not be effectuated by the trial court. Paternal Aunt repeatedly had signaled an unwillingness to accept legal custody of J.N. on a permanent basis, and ultimately asked that he be removed from her home because she no longer was able to manage his behavioral issues and needs. That factor also did not support returning J.N. to Father's custody.

**{¶ 37}** Perhaps most significantly for purposes of the trial court's determination of J.N.'s best interest, competent, credible evidence supported a conclusion that J.N.'s "need for a legally secure permanent placement" could *not* "be achieved without a grant of permanent custody to the agency." *See* R.C. 215.414(D)(1)(d). Despite evidence suggesting that J.N. was in particular need of a stable home environment due to significant behavioral and psychological issues requiring intensive treatment, the trial court noted that J.N. had been through a total of seven placements by the time DJFS moved for permanent custody. Mother had demonstrated little interest in or ability to resume caring for J.N. A prior placement with Father was disrupted by Father's August 2017 hospitalization for severe mental health issues, reportedly exacerbated by illicit drug use.[10] Subsequently, Father reported to DJFS that he was engaged in "heavy drug use" – "specifically meth." (Tr., p. 26, 11.) Although Father later underwent treatment and at trial testified he had "been sober" since March 14, 2019 (Tr., p. 37), his refusal to sign

---

[10] Medical records indicated that Father tested positive for cocaine during that hospitalization; at trial, after repeatedly deflecting cross-examination questions about his drug use, Father eventually acknowledged having used cocaine while he had custody of J.N. (*See* Tr., pp. 47-49).

releases left DJFS unable to confirm his claims to have successfully completed treatment for both his mental health issues and his alleged abuse of drugs and alcohol.

{¶ 38} Similarly, although Father testified that he was living in a one-room "cottage" located on a property where he also had access to a relative's larger home, Amato testified that Father's refusal to communicate with social worker Campbell meant that DJFS had been unable to inspect the cottage to assess the conditions in which Father proposed to house J.N. Other portions of the record tended to further corroborate the trial court's characterization of Father's conduct as "combative." (11/20/19 Judgment Entry, p. 4.)

{¶ 39} Father's proposed justification for his refusal to participate in domestic violence classes is one example. Addressing the requirements set forth in the DJFS case plan, Father testified, "She [the social worker] had a whole bunch of stuff she needed me to do. [As to] the domestic violence class, I told her that was nowhere on the table because I never have been charged with domestic violence." (Tr., p. 33.) When Father was questioned further about that subject on cross-examination, the following exchange occurred:

Q: Weren't you convicted of threatening [Mother] in 2019?

A: No.

Q: So you were not convicted of domestic violence in – I'm sorry, 2009?

A: No. Threatening, or domestic violence?

Q: Threatening her?

A: It was dropped to a lower thing so.

Q: But you were given 30 days in jail, correct?

A: That was suspended.

Q: You were sentenced to 30 days in jail for threatening [Mother]; is that correct?

A: Well, if I was – if it was suspended, then no, I didn't, because I never was –

Q: So you never served the jail time, but you were convicted and sentenced to 30 days suspended jail.

A: I'm not for sure if that's what they did, but I didn't do no time in jail though. I didn't so.

Q: But it was for threating [Mother]?

A: Actually, no. To be honest with you, no, that ain't what happened.

Q: You pled guilty though, correct?

A: Did I plead guilty?

Q: Yes.

A: Yes, I did.

Q: Okay. And [J.N.] was present when that happened, wasn't he?

A: Actually, [J.N.] was a baby.

Q: Yeah, but he was there?

A: The situation occurred –

Q: No. Was he there?

A: Was he there?

Q: Yes or no?

A: I mean, yeah, he probably was there.

Q: Okay.

A: Well, actually, no, he was there; he was sleeping.

Q: You actually had an offense for threatening a family or household member at that time while the child was present, and you don't think you need domestic violence classes?

A: Well, actually, no. I threatened [Mother's boyfriend]. That's who I threatened. I didn't threaten him. I went in --

Q: You pled – this is the question. Did you plead guilty to that – to that --   to that offense and that incident in 2009?

A: Yes. I was coerced into doing something.

Q: Yes. Yes, that's fine. So even though you have that conviction on your record, you don't think domestic violence classes would be appropriate?

A: No. Cause verbal abuse and domestic violence is two different things.

(Tr., p. 55-56.)

{¶ 40} Similarly contentious exchanges regarding Father's resistance to the suggestion that J.N. be treated with Ritalin (*id.*, p. 57) and about Father's own mental health treatment (*id.*, p. 57-61.) followed. Father then attributed his failure to see J.N. in more than seven months to his (Father's) dispute with Campbell, calling his refusal to attend supervised visitation "[a] peaceful protest; that was my right, right or wrong." (*Id.*, p. 61.) Father's confirmation of his willingness to forego seeing J.N. due to his personal dissatisfaction with the social worker's handling of the case lent further weight to the trial court's conclusion that placement with Father would not be most beneficial to J.N.

{¶ 41} Having reviewed the entire record, we conclude that competent, credible

evidence supports the trial court's conclusion that clear and convincing evidence showed an award of permanent custody to DJFS to be in J.N.'s best interest. Father's assignment of error is overruled.

## Conclusion

**{¶ 42}** For the foregoing reasons, the judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and HALL, J., concur.

Copies sent to:

John M. Lintz
Kirsten Knight
John S. Pinard
James Griffin, GAL
Hon. Katrine Lancaster