**[Cite as *In re T.H.*, 2022-Ohio-1186.]**

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**DARKE COUNTY**

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| | : | |
| IN THE MATTER OF: T.H. & T.E. | : | Appellate Case No. 2022-CA-1 |
| | : | |
| | : | Trial Court Case Nos. 21930013 & |
| | : | 21930014 |
| | : | |
| | : | (Appeal from Common Pleas |
| | : | Court – Juvenile Division) |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 8th day of April, 2022.

. . . . . . . . . . .

KANDY HEAVILIN FOLEY, Atty. Reg. No. 0042085, Assistant Prosecuting Attorney, Darke County Job & Family Services, 631 Wagner Avenue, Greenville, Ohio 45331
        Attorney for Plaintiff-Appellee, Darke County Children Services

ALEXANDRIA HORNER, Atty. Reg. No. 100448, P.O. Box 158, Greenville, Ohio 45331
        Attorney for Defendant-Appellant, Mother

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} Appellant-Mother appeals from the judgment of the Darke County Court of Common Pleas, Juvenile Division, which granted permanent custody of her biological daughters, T.H. and T.E., to Darke County Children Services ("Children Services"). For the reasons that follow, the judgment of the trial court will be affirmed.

## I.      Facts and Procedural History

{¶ 2}   T.H. and T.E. were born to Mother and Father (who is not a party to this appeal) in September 2019, and August 2017, respectively. On September 24, 2019, Children Services filed a complaint alleging that T.H. was an abused child as she was born with methamphetamines in her system. The following day, Children Services filed a complaint alleging T.E. to be a dependent child based her sibling's abuse allegations. Both children were placed into the temporary custody of Children Services in late September 2019. Their foster family retained custody throughout the case.

{¶ 3} The trial court then established family reunification goals based on a Children Services case plan. Mother was ordered to obtain and keep suitable housing, maintain a legal source of income, attend and complete substance abuse treatment, complete mental health treatment, abstain from using illegal drugs, abstain from drinking alcohol, submit to random drug tests, complete a parenting and budgeting class, and pay child support of $32 a month. Additionally, Children Services mandated that persons not approved by the agency could not reside in Mother's home, spend the night, or be present during parenting time with the children.

{¶ 4} Both parties agree that, initially, Mother made progress toward reunification. She completed mental health and substance abuse treatment, found employment, and

obtained suitable housing in Union City, Indiana (Union City exists on both sides of the Ohio-Indiana border). Mother also made notable progress with visitation, advancing to the point where the girls joined her for overnight visits in her home.

{¶ 5} Moving to the Indiana side of Union City, however, complicated the process, as Darke County Children Services could no longer work with Mother. Instead, the parties requested that the State of Indiana, through the Interstate Compact on the Placement of Children ("ICPC"), handle the case.

{¶ 6} While Mother made progress towards reunification for a time, things took a turn for the worse in the spring of 2021; on April 27 and May 4, Mother tested positive for cocaine, an illegal narcotic, in contravention of her case plan objectives. The positive drug tests resulted in the ICPC placement being denied by the State of Indiana. Around that same time, Children Services received reports that Mother was abusing alcohol and violating court orders by permitting Father to stay in her home. Then, on June 4, 2021, Mother was involved in a car crash in Mercer County which resulted in charges for operating a vehicle under the influence (OVI). During the investigation into the accident, she refused to take a breath test, so an automatic license suspension was instituted. Finally, on September 27, 2021, Mother was charged with driving under suspension in Darke County.

{¶ 7} On June 15, 2021, Children Services filed a motion for permanent custody of T.H. and T.E. After a hearing on December 10, the trial court issued a judgment entry on December 14, 2021, which awarded the permanent custody of the girls to Children Services and terminated the parental rights of Mother and Father.

{¶ 8} Mother has appealed and now raises two assignments of error.

## II. The grant of permanent custody to Children Services was proper

{¶ 9} In her first assignment of error, Mother asserts that the trial court erred by granting permanent custody of T.H. and T.E. to Children Services as the decision was against the weight of the evidence.

{¶ 10} The United States Supreme Court has described parents' interest in the care, custody, and control of their children as "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). The interest, however, is not absolute. "The state has broad authority to intervene to protect children from abuse and neglect." *State ex rel. Allen Cty. Children Servs. Bd. v. Mercer Cty. Common Pleas Court, Prob. Div*., 150 Ohio St.3d 230, 2016-Ohio-7382, 81 N.E.3d 380, ¶ 58 (O'Connor, C.J., dissenting).

{¶ 11} Because awarding permanent custody is a "drastic remedy that involves the termination of parental rights, permanent custody determinations must be based upon clear and convincing evidence." (Citations omitted.) *Id*. "Clear and convincing" means more than a preponderance, but less than "clear and unequivocal." *In re Rose*, 2017-Ohio-694, 85 N.E.3d 498, ¶ 19 (2d Dist.).

{¶ 12} R.C. 2151.414 sets forth a two-part analysis for courts to consider when determining a motion for permanent custody to a public children services agency. First, the trial court must find by clear and convincing evidence that the child either (a) cannot or should not be placed with the parent within a reasonable time; (b) is abandoned; (c) is orphaned with no relatives above to take permanent custody; or (d) has been in the

temporary custody of a public or private children services agency for 12 or more months of a consecutive 22-month period. *In the Matter of I.W.*, 2d Dist. Clark No. 2019-CA-76, ¶ 20; R.C. 2151.414(B)(1). If the first prong is met, the court must then determine whether granting permanent custody is in the best interest of the child. *In the Matter of J.N.* 2d Dist. Clark No. 2019-CA-82, 2020-Ohio-4157, ¶ 26; R.C. 2151.414(B)(1).

{¶ 13} To assist with this determination, R.C. 2151.414(D)(1) sets out factors the court must consider:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

"No one element is given greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57.

{¶ 14} When a party challenges the permanent custody decision as being against the weight of the evidence, the reviewing court takes a deferential stance. This court has

stated that a reviewing court will not overturn a trial court's grant of permanent custody to the state as being contrary to the weight of the evidence " 'if the record contains competent, credible evidence by which the Court could have formed a firm belief or conviction that the essential statutory elements * * * have been established.' " *In re R.L., A.L. and A.L.*, 2d Dist. Greene Nos. 2012-CA-32, 2012-CA-33, 2012-Ohio-6049, ¶ 17, quoting *In re A.U.*, 2d Dist. Montgomery No. 22287, 2008-Ohio-187, ¶ 9.

{¶ 15} In this case, there was ample evidence to support the establishment of the statutory elements. As stated above, permanent custody may be granted if the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period and if the grant of permanent custody is in the best interest of the child. R.C. 2151.414(B)(1)(a). When the permanent custody motion was filed, T.H. and T.E. had been in the temporary custody of Children Services between September 2019 and June 2021 – more than the statutory requisite. With that determination made, the only other necessary finding was whether granting permanent custody was in the best interest of the children. We agree with the trial court that it was.

{¶ 16} One of the major issues that came to light at trial was Mother's substance abuse issues. While it is undisputed that early in the reunification process Mother successfully completed substance abuse treatment, whatever progress was made turned out to be short-lived. In April and May 2021, Mother failed two drug screens and tested positive for cocaine. Shortly thereafter, on June 4, 2021, Mother was involved in an alcohol-related crash in Celina. At trial, Officer Jeremy Kerr of the Celina Police Department testified that he arrived on the scene of the crash shortly after it happened

and, when he got to Mother's vehicle, she was unresponsive but breathing. Officer Kerr recounted that the car smelled of alcohol and that there were beer cans in the interior. He also testified that once she came to, Mother's eyes were bloodshot and watery. Then, according to the officer, she refused to speak with him or take a breath test. Officer Kerr cited Mother for OVI, and because she refused the test, an automatic license suspension accompanied the arrest.

{¶ 17} Family members also testified to Mother's substance abuse issues. K.D., the Children paternal aunt, indicated that both Mother and Father abused drugs and that Father stayed overnight with Mother in violation of the case plan. K.D. expressed major concerns about Mother's potentially having custody of the children.

{¶ 18} There were also concerns expressed at trial regarding Mother's ability to meet the needs of T.H. and T.E. The Children foster mother testified that both girls had been diagnosed with Vascular Ehlers-Danlos Syndrome (VEDS), a genetic disorder that affects the blood vessels of organs. According to the testimony, symptoms can be severe and oftentimes lead to shorter-than-average life spans. The foster mother also told the trial court that T.H. suffers from speech and developmental delays and that she attends physical therapy and speech therapy three times per week. T.E. works with a speech therapist as well, and because of other medical issues, sees five or six specialists, including a cardiologist and a neurologist.

{¶ 19} Kerry Perry, Mother's caseworker, and Toni Custer, the court-appointed special advocate (CASA), testified that it would be a "huge challenge" for Mother to meet the girls' educational and medical needs for a couple reasons. First, there were serious

transportation hurdles to clear. Based on Mother's alcohol-related crash and refusal to take a "breathalyzer" test, her driver's license had been suspended, meaning she could not lawfully operate a motor vehicle. This problem was on full display on September 27, 2021, when Mother was charged with driving under suspension in Darke County. The trial court noted that "[Mother] has ten days of jail waiting for her next time she is caught driving, which she continues to do." Decision and Entry at 8-9. Perry also testified that Mother does not carry car insurance. Without the ability to drive, getting the children to their appointments would be extremely difficult.

{¶ 20} Even if Mother were a legal driver, the testimony called into question her ability to get the girls to their appointments. Mother admitted that she did not know who her children's doctors were, and when told that if she were to receive custody of T.H. and T.E., she may not be able use their current providers in Ohio, she expressed to the court that she had not inquired to see if the existing doctors accepted Indiana Medicaid. Mother further testified that she had not researched specialists in Indiana.

{¶ 21} Perry also testified about concerns she had regarding whether Mother could financially meet the needs of her children. According to trial testimony, Mother worked the 10 p.m. to 6 a.m. shift at a local manufacturing facility making $14 or $15 an hour, or about $500 per week. While that was an adequate hourly wage, allowing her to make ends meet right at the time of the hearing, there were questions about whether she could support T.H. and T.E. with that wage. It was noted that two major additional expenses would be incurred if Mother were awarded custody: childcare and car insurance. Indiana Children Services also had concerns that Mother did not earn enough to support the girls.

{¶ 22} Ultimately, it was the opinion of the CASA that permanent custody should be granted to Children Services. "[T]he basic needs of the health and safety of the children are a concern if they would remain in the care of their biological parents." Transcript at 153. Perry testified that she had the following concerns about granting custody to Mother: (1) concern about financial ability to make ends meet with the children; (2) concern that there was no daycare plan; (3) concern about transportation; (4) concern about the OVI; and (5) concern about the children getting the medical attention they needed. Perry concluded that it was in the best interest of T.H. and T.E. to be placed in the permanent custody of Children Services.

{¶ 23} While there was testimony and evidence presented which cast doubt as to whether placing T.H. and T.E. with Mother was in their best interest, there was also evidence to show that granting permanent custody to Children Services was a positive step for the girls. Perry testified that the best place for the children would be with Children Services, and then ultimately the foster family, because the family provided a stable home, love, and care. Custer, the CASA, told the court that she "felt like it would be the best interest of the children to be placed in permanent custody of Children Services" because the foster family was "very much a very functional family." Transcript at 148, 153.

{¶ 24} Foster mother testified to the progress T.H. and T.E. had made in her home. For instance, when T.E. arrived, she was mostly non-verbal, behind on her vaccinations, and had "rotten teeth." After two years in her care, T.E. has really improved and had only minor speech delays. Foster mother also affirmed that both girls call her "mommy" and that she and her husband would "love to be able to continue [to] love and support [the

girls] for as long as we can." Transcript at 140.

{¶ 25} Nevertheless, Mother argues that undue weight was placed on her substance abuse struggles and "speculative concerns about her inability to meet the Children medical needs." Appellant's brief at 13. We disagree. In Mother's case, substance abuse was not some unimportant, secondary issue – it was the root cause of the entire case. T.H. was placed in the temporary custody of Children Services just days after she was born because there were methamphetamines in her bloodstream. That meant that Mother had used methamphetamines – a tremendously dangerous and deadly drug – while extremely pregnant with T.H. That fact alone called into question whether granting Mother custody of the children would be in their best interest. Further, it was not speculation that Mother would be unable to provide for the medical needs of her children. The undisputed trial testimony established that she had no license and no insurance, making it so that Mother could not lawfully drive. Further still, she testified that she had no idea where T.H. and T.E. went to the doctor and did not know if their current specialists (again – she did not know who they are) would accept Indiana Medicaid. Mother also admitted that she did not research specialists in her state of Indiana. Without that basic knowledge and the ability to drive, it is no wonder the trial court emphasized those factors.

{¶ 26} Based on the evidence before us, we conclude that the record contains competent, credible evidence by which the trial court could have formed a firm belief that the essential statutory elements had been established: T.H. and T.E. had been in the temporary custody of Children Services for at least 12 months of a consecutive 22-month period; and granting permanent custody was in the best interest of the children. It was not

against the weight of the evidence to place T.H. and T.E. in the permanent custody of Children Services. We cannot say the trial court erred, and Mother's first assignment of error is overruled.

### III.    Granting permanent custody was in the best interest of T.H. and T.E.

{¶ 27} In her second assignment of error, Mother makes a related argument to her first – that the trial court erred by determining that granting permanent custody to Children Services was in the best interest of T.H. and T.E.

{¶ 28} When determining whether granting permanent custody is in the best interest of a child, the court must consider five factors outlined in R.C. 2151.414(D)(1)(a)-(e). And while the trial court stated that it considered all the factors, it found several to be particularly relevant. For instance, the trial court found the first factor (the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child) to be important. Here, the record demonstrates that T.H. and T.E. had close relationships with their foster parents. In fact, they were the only parents T.H. had ever known. There is also evidence in the record that the girls had bonded with the foster family's other daughter and call them "mommy" and "daddy." The CASA testified that the foster family was "very much a very functional family." Mother, however, points out that there had been successful overnight visits with her, and while that is true, there was also testimony at trial that visits with Mother had been "sporadic" and that cancelling the visits really threw off T.E., causing fits and crying, and that Mother sent the girls back after the visit eating cookies for breakfast. We agree with the trial court that this factor weighed in favor of

granting permanent custody to Children Services.

{¶ 29} The trial court also focused on the third factor, the custodial history of the children, which also cut in favor of granting permanent custody. For T.H., the foster parents were the only parents she had ever known, as she was placed with them when she was less than a week old. As for T.E., she had been with the foster family for half of her life. The custodial history favored the award of permanent custody to Children Services.

{¶ 30} The final factor emphasized by the trial court was the Children need for a legally secure permanent placement and whether that type of placement could be achieved without a grant of permanent custody to the agency. Based on the Children physical and developmental challenges, permanency and finality were paramount, and based on the evidence presented, a legally secure permanent placement would only be found with a grant of permanent custody. Mother lost custody of T.H. and T.E. initially because T.H. tested positive for drugs at birth, and while the parties agree that Mother was clean at points during this case, there was evidence (in the form of two cocaine-positive drug screens and an OVI charge) that she continued to struggle with addiction. We cannot say that the trial court erred in finding this factor weighed in favor of awarding permanent custody to Children Services.

{¶ 31} Mother seems to argue that the trial court should have discussed all the R.C. 2151.414(D)(1)(a)-(e) factors, but that was unnecessary. The Ohio Supreme Court has stated that a juvenile court is not required to expressly discuss each of the statutory best interest factors when it determines if granting permanent custody is appropriate. *In*

*re A.M.*, Ohio Slip Opinion No. 2020-Ohio-5102, __ N.E.3d __, ¶ 31. "Consideration is all the statute requires." *Id.* In this case, the trial court stated that it considered all the factors, but only expounded on three of them. There was no error there.

**{¶ 32}** The trial court's decision that it was in the best interest of T.H. and T.E. to be placed in the permanent custody of Children Services was supported by clear and convincing evidence. Mother's second assignment of error is overruled.


### IV.     Conclusion

**{¶ 33}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .


DONOVAN, J. and WELBAUM, J., concur.


Copies sent to:

Kandy Heavilin Foley
Alexandria Horner
James Scott Detling
Hon. Jason Aslinger